IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ERIKA WALKIRIA NAJERA AGUIRRE, | ) |
| *Petitioner*, | ) |
| v. | ) Civil Action No. 1:23-cv-302 (PTG/JFA) |
| VICTOR J. HERNANDEZ VILLATORO, | ) |
| *Respondent*. | ) |

## MEMORANDUM OPINION

Petitioner Erika Walkiria Najera Aguirre brought this action under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et. seq.*, to secure the return of her child, "J.N.," to Honduras from the custody of Respondent Victor J. Hernandez Villatoro, the child's father. In the alternative, Petitioner requests that she "be granted her rights to access the Minor Child pursuant to the [Hague] Convention." Dkt. 1 at 11. Since late 2018, the child has lived in the United States after Respondent removed the child without the mother's knowledge or authorization.

On June 13 and June 14, 2024, the Court held a bench trial on the matter. Petitioner presented the testimony of four witnesses: (1) Petitioner; (2) Maria Del Carmen Aguirre, Petitioner's mother; (3) Respondent; and (4) Marielena Villatoro, Respondent's mother. Respondent presented the testimony of three witnesses: (1) Respondent; (2) Maria Moreno, Respondent's partner; and (3) Denise Tassi, guardian *ad litem* for the child, J.N. Petitioner re-called one witness, Marielena Villatoro, to testify on rebuttal. The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1. Petitioner Erika Walkiria Najera Aguirre resides in Tocoa, Colón, Honduras and is employed as an administrator of a financial company. Petitioner has lived in Honduras her entire life.

2. Respondent Victor J. Hernandez Villatoro resides in Manassas, Virginia, in the United States of America and maintains stable employment "do[ing] bodywork and painting . . . cars." Respondent was born in Honduras and resided there until he left for the United States in 2018.

3. Petitioner and Respondent were involved in a romantic relationship that spanned many years and lived together in Honduras. In December 2015, they had a child, J.N.

4. In March 2018, Petitioner and Respondent's romantic relationship ended.

5. During the time J.N. lived in Honduras, Petitioner and Respondent shared custody of and cared for J.N. Petitioner was a student and worked, and Respondent worked. Thus, the child's maternal and paternal grandmothers assisted with J.N.'s care. J.N.'s maternal grandmother cared for J.N. during the weekday and J.N.'s paternal grandmother would assist with care on the weekends. The child's family lived in a quiet, safe neighborhood. Both Petitioner and Respondent would drop J.N. off at the grandmothers' homes.

6. At night, J.N. was either with Petitioner or Respondent. A year prior to Respondent's departure, he had mentioned leaving Honduras with J.N. Petitioner thought Respondent was joking. Respondent never brought it up again.

7. In November/December 2018, Respondent took J.N. from Honduras, heading for the United States. They traveled by bus through Guatemala and Mexico and crossed on foot into

2

the United States. J.N. was three years old at the time. Prior to removal, J.N. resided his entire life in Honduras.

8.    Respondent never told Petitioner of his plans, and Petitioner never provided permission for Respondent to take her child. In fact, she first learned of Respondent and J.N.'s departure from Respondent's brother.

9.    Once Respondent and J.N. arrived in the United States, Respondent took J.N. to Manassas, Virginia because Respondent had family there. In March 2019, Petitioner was able to speak with Respondent via phone. Petitioner begged Respondent to return J.N., but Respondent refused.

10.    In June 2019, Petitioner attempted to cross into the United States to reunite with J.N. However, she was intercepted at the border and removed.

11.    In the summer of 2019, Respondent became involved in a romantic relationship with Ms. Moreno. After a while, Petitioner and Respondent's phone calls became contentious and Respondent cut off communications in May 2020.

12.    In 2020, Respondent filed a petition for custody of J.N. in the Prince William County Juvenile and Domestic Relations Court. *See* Respondent's Exhibit 2. On June 8, 2020, Petitioner filed an application for the return of J.N. through the Central Authority pursuant to the Hague Convention. In January 2022, Petitioner filed a verified complaint for the return of J.N. in this Court.[1] Respondent appeared and filed an Answer. *See* No. 1:22-cv-11, Dkt. 4. By March 2022, Petitioner filed a Stipulation of Dismissal. *See* No. 1:22-cv-11, Dkt. 6.

---

[1] At trial, Petitioner testified that she was only about nineteen or twenty at this time and that she had to raise money to pay for a lawyer.

3

13. As stated, J.N. arrived in the United States when he was three years old. At the time of the bench trial, J.N. was eight. Accordingly, J.N. had lived in the United States, specifically Virginia, the majority of J.N.'s life.

14. Since entering J.N.'s life, Ms. Moreno has acted as J.N.'s mother. Respondent, Ms. Moreno, Ms. Moreno's older child, and J.N. formed a family unit. Thereafter, Respondent and Ms. Moreno had another child, J.N.'s half-sibling. Now, Respondent, Ms. Moreno, and all three children live together, and Respondent and Ms. Moreno plan to marry and purchase a home.

15. Ms. Moreno takes care of J.N. Monday through Friday while Respondent works. Respondent is responsible for the care of J.N. and the other children when Respondent returns home from work on weekdays and on weekends, while Ms. Moreno works. Ms. Moreno and Respondent both cook for the family. Respondent takes J.N. to the doctor and dentist regularly for checkups, and both Respondent and Ms. Moreno assist J.N. with homework. The family lives in a nice, quiet neighborhood.

16. J.N. is a happy and well-adjusted child. J.N. has attended the same elementary school for four years. J.N. almost never misses a day of school and is doing well in his classes. J.N. attends taekwondo classes five days a week at an academy near his home. Respondent and J.N. also attend extracurricular events at J.N.'s school, such as cultural days, yard sales, and book sales.

17. J.N. has friends in his taekwondo classes as well as at school. J.N. is close with his father and his younger half-sibling, as well as with Ms. Moreno and Ms. Moreno's older child. J.N. and his household are a "very close-knit family."

18. Respondent works five days a week "do[ing] bodywork and painting . . . cars." Respondent also plans to start a car towing business.

19. Respondent and J.N. are not United States citizens nor green-card holders, although the record is unclear as to the exact immigration statuses of Respondent and J.N. Respondent testified that he has his "work permit" and never applied for "special immigrant juvenile status" for J.N. When questioned about his immigration status, Respondent answered that he "do[es]n't have any orders" and " do[es]n't have any problems." Respondent also testified that he and J.N. have social security numbers.

20. On March 7, 2023, Petitioner filed the Verified Complaint for Return of Minor Child to Honduras or in the Alternative, Petition for Access from the United States.[2] During the pendency of this case, the Court issued two show cause orders regarding Petitioner's delays and failure to prosecute this case. *See* Dkts. 25, 33.

## CONCLUSIONS OF LAW

1. "Under the Hague Convention, to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that 'the child has been wrongfully removed' within the meaning of the Convention." *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (quoting 42 U.S.C. § 11603). To establish that the removal of a child is "wrongful," a petitioner must establish that: "(1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of h[er] home state, and (3) the petitioner had been exercising those rights at the time of removal." *Id.* (quoting *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006)).

---

[2] At that point, J.N. had been with Respondent in the United States for close to four and a half years.

5

2. "Upon a showing of wrongful removal, return of the child is required unless the respondent establishes one of four defenses." *Id.* (citing *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001)).

3. Two of the defenses are: "(1) that return would expose the child to a 'grave risk' of 'physical or psychological harm or otherwise place [the child] in an intolerable situation'"; and (2) that return "would not be permitted by 'fundamental principles of the United States relating to the protection of human rights and fundamental freedoms.'" *Id.* (alteration in original) (quoting *Miller*, 240 F.3d at 398). A petitioner must establish these defenses by clear and convincing evidence. *Id.*

4. The other two defenses are: (3) "that the petition for return was not filed within one year of the removal and the child is now well-settled in another country"; and (4) "that the petitioner was not actually exercising h[er] custodial rights at the time of the removal or had consented to or acquiesced in the removal." *Id.* at 668–69. A petitioner must establish these defenses by a preponderance of the evidence. *Id.* at 668.

5. In this case, the Court finds that the preponderance of the evidence establishes that J.N.'s removal from Honduras was wrongful. First, it is undisputed that prior to his removal, J.N. was habitually resident in Honduras. The child, as well as both parents, had resided their entire lives there.

6. It is also clear by a preponderance of the evidence that Respondent's removal of J.N. was in breach of Petitioner's custodial rights and she was exercising those rights at the time of removal. Whether a parent is exercising lawful custody of a child at the time of removal is determined under the laws of the child's habitual residence. *White v. White*, 718 F.3d 300, 303 (4th Cir. 2013). There is no evidence that the parents had a formal custody agreement.

However, Petitioner submitted relevant portions of the Honduran Civil Code, which provide that, absent a ruling from the court, the exercise of parental authority, which includes custody, belongs to both parents jointly. *See* Petitioner's Exhibit 9 (translation of Articles 185, 186, 187, 193 of the Family Code, Title V of Custody).[3] The Honduran Civil Code also provides that if parental authority is exercised by both parents, a parent must have the written authorization of the other parent to leave the country with the child. *Id.* (translation of Article 101, Code of Childhood and Adolescence, Chapter III, Authorization to Travel).

7. The Court credits the evidence offered by Petitioner and her witnesses that, at the time of removal, Petitioner was exercising her custody rights. While both grandmothers assisted with J.N.'s care, Petitioner still cared for J.N. when she was not working or studying.[4] Despite this, Respondent picked up J.N. from his paternal grandmother's home and departed Honduras with him. Respondent did not obtain Petitioner's authorization – written or otherwise. In fact, he did not even tell Petitioner about his plans at the time he departed with J.N. In sum, a preponderance of the evidence establishes all elements to provide that Respondent wrongfully removed J.N. from Honduras.

8. Even though the removal was wrongful, the Court finds that Respondent has established one of the defenses by a preponderance of the evidence: that the petition for return

---

[3] The Court received these "translations" as evidence but notes that they are not certified translations of the Honduran Civil Code.

[4] At trial, Respondent testified that after his and Petitioner's relationship ended, Petitioner disappeared, both grandmothers stopped caring for the child, and that Respondent would take J.N. to the body shop where Respondent worked in order for Respondent to care for the child during the day. This account was contradicted by the testimony of Petitioner, her mother, and Respondent's own mother. The Court did not find Respondent's testimony on this issue credible.

7

was not filed within one year of J.N.'s removal from Honduras and J.N. is now well-settled in the United States. In fact, the evidence on this issue is overwhelming.

9. "The key dates under the Hague Convention are the dates of the wrongful removal or detention and the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is located." *Alcala v. Hernandez*, 2015 WL 4429425, at *10 (D.S.C. July 20, 2015), *aff'd*, 826 F.3d 161 (4th Cir. 2016); *see* Hague Convention on the Civil Aspects of International Child Abduction art. 12, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501.

10. Here, J.N. was removed from Honduras in late 2018 and Petitioner did not initiate the instant proceedings until March 2023, well over one year after the removal. In fact, this instant Verified Complaint was filed over four and a half years after J.N. left Honduras. Plaintiff even waited a year and a half after J.N.'s removal before filing an application with the Central Authority; she waited three years from J.N.'s removal to file her first Verified Complaint for J.N.'s return in this Court, which she later voluntarily dismissed.

11. "[F]or a child to be settled within the meaning of the Convention, the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment." *Alcala v. Hernandez*, 826 F.3d 161, 170 (4th Cir. 2016). In determining whether a child is well-settled, "courts should consider any relevant circumstance that demonstrates security, stability, or permanence—or the lack thereof—in a child's new environment." *Id.* at 170–71.

12. In making this determination, a court can also consider the following factors:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school

8

> activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Id.* at 171 (alteration in original).

13. Consideration of these factors is not determinative, but these factors assist the Court in making "a holistic determination of whether a child has significant connections demonstrating a secure, stable, and permanent life in his or her new environment." *Id.* This analysis should not be confused with a determination of the "best interests of the child" inquiry that is typical in child custody cases. *Id.* "A court determining whether a child is settled must focus on the significance of the child's connections to her or his new environment; it should not compare the child's current situation with her or his prior situation or expected situation if returned." *Id.*

14. The Court concludes by a preponderance of evidence that J.N. is well-settled in Virginia. At the time of trial, J.N. was eight years old. J.N. came to the United States when he was about three years old. J.N. spent his first three years in Honduras. By the time the instant Verified Complaint was filed, J.N. had spent four and a half years in the United States. Thus, J.N. has lived the majority of his life in the United States, specifically Virginia, having resided in Virginia since late 2018/early 2019.

15. The Court finds that J.N.'s residence is stable. J.N. lives with his father, Respondent; Respondent's partner, Ms. Moreno; Ms. Moreno's older child; and J.N.'s younger half-sibling. Respondent and Ms. Moreno have been a couple since the summer of 2019 and have plans to marry. J.N. and his family have lived at their current residence for about two years and have renewed the lease for another year. Before that, they lived at a different residence, close to their current residence, for about a year. While Petitioner offered evidence that

Respondent moved to a number of other residences when he first arrived in the United States, that does not bear on J.N. and Respondent's current stability. Respondent and Ms. Moreno also plan to buy a house.

16. The Court also finds that Respondent has provided a stable home life for J.N. Ms. Moreno cares for J.N. Monday through Friday while Respondent works. Then, Respondent cares for J.N. and the other children at night and on weekends while Ms. Moreno works. Respondent and Ms. Moreno also help J.N. with his schoolwork.

17. The Court finds that J.N. attends school consistently. J.N. has attended the same elementary school for about four years, has excellent school attendance, and is doing well in his classes. *See* Respondent Exhibits 4, 5, 6 (report cards). J.N. received a Student of the Week Award twice. J.N. also participates in community and extracurricular school activities regularly. J.N. attends taekwondo classes five days a week, and Respondent and J.N. also attend school events.

18. The Court also finds that Respondent has stable employment and finances. Respondent works five days a week and plans to start a car towing business. Respondent is able to afford the basic necessities for J.N., such as food, clothing, and shelter. Respondent is able to afford beyond the basic necessities as well—J.N. participates in taekwondo, is well-dressed, and has regular doctor's and dentist's appointments.

19. The evidence also establishes that J.N. has friends and relatives in Virginia. J.N. has friends from his taekwondo classes and school. In addition to Respondent, J.N. has a younger half-sibling with whom he is close, as well as Ms. Moreno and Ms. Moreno's older child. J.N.'s household is a "very close-knit family." Respondent and Ms. Moreno testified as to

the closeness of the family and the guardian *ad litem* testified that she observed it as well when she visited the home.

20. Under the Hague Convention, "a lack of immigration status" is not "a bar to finding that a child is settled." *Alcala*, 826 F.3d at 173; *Cuenca v. Rojas*, 99 F.4th 1344, 1351 (11th Cir. 2024) (same). "If a child is functionally settled, such that ordering his or her return would be harmfully disruptive, it would be odd to nevertheless order that [the child's life be] disrupt[ed] based on a formal categorization." *Alcala*, 826 F.3d at 173. "'[I]mmigration status is neither dispositive nor subject to categorical rules,' but should instead be considered in the totality of the child's circumstances." *Id.* at 174 (quoting *Hernandez v. Garcia Pena*, 820 F.3d 782, 788 (5th Cir. 2016)).

21. The fact that Respondent and J.N. are neither United States citizens nor green card holders are cause for concern. However, when questioned about his immigration status, Respondent testified that he "do[es]n't have any orders" and " do[es]n't have any problems" and that he and J.N. have social security numbers and Respondent has work authorization.

22. Accordingly, after considering the factors enumerated in *Alcala* and evaluating whether J.N. has significant connections that demonstrate security, stability, and permanency, the Court finds that Respondent has established by a preponderance of the evidence that J.N. is well-settled in his new environment. *Cf. Alcala*, 826 F.3d at 173–74 (concluding that, although the respondent and child "lack[ed] a lawful immigration status," the district court did not err in finding that the child was well-settled when "[t]he record facts as a whole establish that [the child] has developed significant connections to his new environment such that his life is stable, secure, and permanent"). In fact, the record establishes that J.N. is "thriving" in his new environment—he is part of a close-knit family/household, involved in extracurriculars in the

11

area, doing well in school, has friends in the area, and has all his needs met, if not exceeded. *See id.* at 173 (noting, in its analysis of whether the children were settled, that the children were "thriving").

23. "[U]nder the Hague Convention[,] courts retain the discretion to order return even if one of the exceptions is proven." *Id.* at 175. "However, the Convention provides no explicit guidance as to when a court should exercise such discretion." *Id.* "[T]he discretion to order return is grounded in principles of equity." *Id.* In this case, the Court is troubled by Respondent's conduct: leaving the country with J.N. without the Petitioner's knowledge or approval and blocking communications between Petitioner and her child. Most concerning, Respondent did not even tell J.N. of his mother's existence, allowing J.N. to believe Ms. Moreno was J.N.'s mother, until the Court urged the parties to devise a plan for Petitioner to have access to J.N. during the pendency of this case. *See* Dkt. 68 (parties' joint status report indicating that the parties agreed to allow Petitioner to have video contact with the child on Sundays at 3:00 p.m. and it has been occurring regularly). The Court is also troubled by Petitioner's failure to consistently seek the return of her child during the four and a half years since his removal. Ultimately, the Court finds that to remove J.N. from the only home he recalls, from the stability that he has enjoyed, would be too harmful and disruptive to J.N.

24. As to Petitioner's "alternative" request that she "be granted her rights to access the Minor Child pursuant to the [Hague] Convention," "under the [Hague] Convention, [Petitioner] has no right to initiate judicial proceedings for access claims and the federal courts are not authorized to exercise jurisdiction over the access claims brought by" Petitioner. *Cantor v. Cohen*, 442 F.3d 196, 197, 200 (4th Cir. 2006) (affirming district court's dismissal of the

12

petitioner's access claims pursuant to the Hague Convention for lack of jurisdiction). Accordingly, the Court must dismiss Petitioner's access claims for lack of jurisdiction.

25.     To be clear, this Court's decision not to return J.N. to Honduras is not a custody determination nor an indication that Petitioner should not have access to J.N.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Petitioner's Verified Complaint, pursuant to the Hague Convention, seeking return of J.N. to Honduras, to Petitioner's custody. The Court finds that, although J.N.'s removal from Honduras was wrongful, Respondent has established by a preponderance of the evidence that the petition for return was not filed within one year of the removal and J.N. is now well-settled in the United States. The Court **DISMISSES without prejudice** the Petitioner's request that she be granted her access rights to J.N. under the Hague Convention, because the Court lacks jurisdiction as to that request.

A separate order will issue.

December 20, 2024
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge